## GARRISON MOTOR FREIGHT, INC., et al
### *v.* MISTLETOE EXPRESS SERVICE

74-293                                    521 S.W. 2d 830

Opinion delivered April 28, 1975

**2**

*Louis Tarlowski* and *Charles J. Lincoln II*, for appellants.

*Hardin, Jesson & Dawson* and *Max G. Morgan* and *T. M. Brown*, Oklahoma City., for appellee.

CARLETON HARRIS, Chief Justice. By application filed with the Arkansas Transportation Commission, Mistletoe Express Service of Oklahoma City, appellee herein, sought a certificate of public convenience and necessity as a motor carrier, intrastate in "express service" limited to shipments not exceeding 350 pounds. The application embraced 14 separate and distinct routes of a wide area of this state. Originally, 19 companies protested at the hearings held by the commission, and 36 witnesses testified on behalf of the public. Subsequent to the conclusion of the hearing, the commission granted the application with certain modifications, and from that order, appellants appealed to the Pulaski County Circuit Court. Upon that court's affirmance of the commission order, appellants have appealed to this court. For reversal, appellants rely upon one point, *viz.*, "That the judgment of the Pulaski Circuit Court, Second Division, made and entered herein, is contrary to the preponderance of the evidence of record, insofar as it relates and pertains to the specific routes and points served by the appellants, and public convenience and necessity have not been proved for these routes and points." In other words, protestants' appeal relates only to those routes affecting its operations.[1]

---

[1]Garrison protested routes 1, 2 and 3 of the application as follows:

"1. Between Fort Smith and Conway, over U.S. Highway 64.
2. Between Fort Smith and Harrison, over U.S. Highway 71 to Rogers; thence over U.S. Highway 62 to Harrison.
3. Between Conway and Pine Bluff, over U.S. Highway 65. Since the application seeks the authority to serve intermediate points, Little Rock is involved in Route 3."

Superior Forwarding Company, Inc., covered the following routes:

In granting authority requested by Mistletoe, the commission made the following pertinent findings:

"(1) No shipment shall exceed 350 pounds from any one consignor to any consignee on any one day; (2) The holder shall be precluded from filing volume rates. Its charge shall be graduated from 1 pound to 100 pounds and shipments exceeding 100 pounds shall be assessed at the weight times the applicable 100 pound rate.[2]
***

"Applicant is a wholly owned subsidiary of the Oklahoma Publishing Company. It has operated over 40 years as a motor common carrier of general commodities moving in express service. Intrastate service is conducted in Kansas, and it holds certain interstate operations between points in Texas, Oklahoma, Kansas and Missouri. An application for interstate authority in Arkansas which generally duplicates the intrastate authority sought in this application was approved by I.C.C. on July 12, 1973, Docket No. MC 42405 (sub 29). *** It proposes to handle primarily small shipments, including articles of unusual value. Rates proposed will be generally higher than those of other motor carriers asserting that freight artificial minimums and single shipment charges make higher freight charges at lesser weight. It will have no minimum charge but will have a progressive rate structure beginning at one pound and progressing by pounds to 100 pounds. Its liability for loss or damage would be limited to $50.00 per shipment or fifty (50) cents per pound unless a higher value is

"3. Between Little Rock and Pine Bluff.
4. Between Little Rock and Sheridan.
5. Between Pine Bluff and Sheridan.
7. Between Little Rock, Benton, Malvern and Arkadelphia.
9. Between Little Rock, Benton and Hot Springs.
10. Between Pine Bluff and Hot Springs.

Serving all intermediate points upon the foregoing routes."

Midway Motor Freight Lines, Inc. was interested in the following:

"5. Between Fort Smith and Texarkana, Arkansas.
7. Between Texarkana and Little Rock, Arkansas.
10. Between DeQueen and Little Rock, Arkansas."

[2] This was the authority sought.

declared in which event a charge would be made for excess value declared.

"Operating schedules will be published showing arrival times and departures which will be changed only upon notice to the public. Service will be provided five days a week with deliveries on Saturday morning. Daily schedules will be provided from Fort Smith to Little Rock, Little Rock to Pine Bluff and Hot Springs, and Fort Smith to Paris, Booneville, Waldron and Greenwood. An agent will be provided at each service point who will perform an overnight delivery service. A company terminal would be established at Little Rock to which would be assigned four road units and five pickups. One pickup would be based at Pine Bluff, Hot Springs, El Dorado, Magnolia and Camden; Texarkana would be assigned two pickups and one road unit. It is planned to initially base three road units at Fort Smith, one each at Rogers, Pine Bluff, El Dorado, and Magnolia. Applicant has a consistent safety program under the direction of a safety supervisor."

It was then stated that the rates which applicant proposed to apply were based upon the block system used by REA Express, and this system was explained. The commission then extensively reviewed the testimony of a large number of witnesses, followed by a review of the operations of those protesting, including appellants, it being pointed out that figures rendered by these companies, projected on an annual basis, reflected that, as to Superior, about 0.7% of the company's annual revenues would be subject to diversion by the granting of the application, about 2.1% of Garrison Motor Freight, Inc. would be subject to diversion, and 5.7% of Midway's revenues would be subject to diversion. The following findings were then made:

"The Commission feels that the service proposed by the Applicant is a new and additional service which is different from the service of the general commodity carriers, bus companies, and small parcel carriers. This is in line with requirements that a certificate of public convenience and necessity may be granted only when

existing service is inadequate, or additional service would benefit the general public, or the existing carriers have been given an opportunity to furnish the additional service required and have failed to do so. The proposed service of the Applicant differs from the service of general commodity carriers in that there is no minimum charge and more convenient schedules are offered in the service proposed by the Applicant. It is well established that if the primary or sole justification for a grant of authority is that existing rates are too high, or that the proposed service will be less expensive to shippers, the application will be denied. ***

"Upon consideration of all evidence of record, and of the briefs filed by counsel, we find: Applicant is fit, willing and able financially and otherwise properly to perform the proposed service; that present and future public convenience and necessity require the proposed service to the extent hereinafter authorized, and, that the application should be granted as ordered, and in all other respects denied."

In arguing for reversal, appellant calls attention to the fact that it is a rule of universal application in transportation matters that rates are not a factor to be considered in applications seeking certificates of public convenience and necessity, unless such rates are so excessive as to constitute an embargo of the involved traffic. We agree with this argument, and accordingly a discussion of the cases cited by appellant is not necessary. The commission itself apparently gave but little consideration to this phase of the case, stating that minimum rates were only considered as to some small items where the proof reflected that the minimum charge imposed by common carriers exceeded the value of the items shipped which, in the case of some shippers, had resulted in inability to solicit certain small accounts.

It is argued that there has been no showing that existing motor carrier service is inadequate to meet the reasonable transportation requirements of the supporting shippers, and that complaints have pertained only to minimum rates upon

small weight shipments.[3] Perhaps at this point, it would be well to review the applicable law in transportation cases. In the landmark case of *Santee* v. *Brady*, 209 Ark. 224, 189 S.W. 2d 907, we said:

> "This court tries this case *de novo,* and renders such judgment as appears to be warranted and required by the testimony. Such is the provision in §2020, Pope's Digest, and the holding in *Mo. Pac. Rd. Co.* v. *Williams,* and also in *Potashnick Truck Service* v. *Mo. & Ark. Transportation Co.*
>
> 'The general rule is that a certificate may not be granted where there is existing service in operation over the route applied for, unless the service is inadequate, or additional service would benefit the general public, or unless the existing carrier has been given an opportunity to furnish such additional service as may be required.' "

It was then pointed out that public convenience and necessity should be the first consideration and the interest of public utilities already serving the territory secondary. We then quoted 42 C.J. 687 with approval, as follows:

> "'The necessity for the proposed service must be considered as well as the added convenience thereof, although the word "necessity" is not used in this connection in the sense of being essential or absolutely indispensable, but in the sense that the motor vehicle service would be such an improvement of the existing mode of transportation as to justify or warrant the expense of making the improvement.'"

Subsequently, in the same opinion, we restated the general rule and emphasized the word "or" as follows:

> "'The general rule is that a certificate may not be granted where there is existing service in operation over the route applied for, unless the service is inadequate, *or* additional service would benefit the general public, *or*

---

[3]The common carriers have a minimum charge of about $6.00 for each item, irrespective of the weight.

unless the existing carrier has been given an opportunity to furnish such additional service as may be required.' (Italics our own.)

"The opportunity to the existing carriers is in the disjunctive sense of 'or' rather than the conjunctive 'and.' In other words, the certificate may issue if public convenience and necessity be shown, *even if there be already existing service* [Our emphasis], provided the Commission finds either:

a. that the present service is inadequate; or

b. that additional service would benefit the general public; or

c. that the existing carrier has been given an opportunity to furnish additional service as may be required."

The present permit comes under "b", i.e., additional service would benefit the general public. As pointed out by the commission, the general effect of the testimony of most of the witnesses who appeared in support of the application was that they were not presently receiving pickup and delivery service and the witnesses mentioned the slowness of general freight service, together with inconsistent delivery periods and the inconvenience and limitations (size and weight limitations) imposed by bus carriers and U.P.S.[4]

The proposed service differs in several respects. As far as schedules are concerned, Mistletoe proposes to provide overnight and same-day service on *published schedules* which are to be rigidly observed in its operations. The service of the freight lines does not have an established schedule and the evidence shows that deliveries vary from overnight to two to three days. Mistletoe will furnish local pickup and delivery service at each point served while appellants provide local pickup and delivery service in only a few of the larger cities. Likewise, Mistletoe will have a representative in each town served while appellants provide this service only in the cities

[4]United Parcel Service.

where they maintain terminals. While the minimum rate of the freight lines precludes some shippers of small items from using these common carriers, actually shipments over 150 pounds carried by Mistletoe will exceed charges of appellants. It also appears that shippers of the small items, prior to the approval of Mistletoe's application, were largely using bus and small package carriers (not parties to this appeal) with the result that the permit to Mistletoe, even if it should obtain all the traffic at issue (which is hardly likely), would not really deprive the freight lines of any great amount of business.[5] This is reflected by the evidence of the revenues appellants derive from their respective businesses annually.

Appellants suggest that it is doubtful that the commission has jurisdiction to limit the proposed service to shipments not exceeding 350 pounds, but no authority is cited, nor is any provision of the act mentioned in support of this contention.

We conclude that the finding by the commission that the service proposed is a new and additional service, different from the service of the general commodity carriers, and will benefit the general public, is not against the preponderance of the evidence.

Affirmed.

HOLT, J., not participating

---

[5]It is also interesting to note that though possessing the authority, the record reflects that Garrison does not render any service between Little Rock and Pine Bluff, nor between some additional points in Eastern Arkansas.